Good morning, Your Honors, Martin Stern for the Petitioner Voices, along with Brooke Duncan and Marshall Havron. Your Honors, I'd like to start with the purpose of the exclusion that is at issue today. I think it's important to start there briefly because it informs this entire discussion. And I think the purpose of the exclusion is hiding in plain view. The purpose is recognizing the core principle of federalism. That is that the federal government does not interfere in state affairs. Here Congress wants state law to apply to state entities, to state political subdivisions, in particular when it comes to labor relations. Here the board has violated that core principle. It's exercising its jurisdiction over a state political subdivision. And I think I can show that in two ways. There are two ways that the board has erred here. First, it hasn't set out to answer the right question. The right question, of course, is whether Voices is a political subdivision. That's the question under the Act. Instead, the board set out to answer a single, to answer a question that's different. It plucked out of a totality of factors that speak to that, to the real question, the board has plucked out of all of the factors that apply one factor and it's made it the litmus test for its decision. And that, of course, is whether the administrators of Voices are subject to being hired or fired by public officials. And the board has been very upfront that it believes that is the only thing that matters. It says in its brief, in its summary of the argument at page 17, that that is the, quote, dispositive question. If we agree with you that that was errored or rely on this, what you're calling the single factor, should we, would that require us to just remand to have the board look at the totality of factors? I don't think it would require, Your Honors, to do that, although, of course, that would be an option, because I think that the record is clear that, first of all, even under that factor, the board erred, and I'll get to that in just a moment, and second of all, that under the totality of factors, the board, the Voices should be considered a political subdivision. I want to ask you, you mentioned the federalism concerns and you cite a lot of state law. How do you deal with the 2004 Louisiana Attorney General's opinion that public charter, that charter schools are not political subdivisions? Well, the, first of all, the Louisiana Attorney General decisions are not binding. They're not even very authoritative when it comes to stating state law. They're issued, you know, 20 to 30 a week. They're usually very short. They're not given the weight that court decisions are. And second, I would agree, frankly, with the board, that while state law is important, it's not controlling here. This is an issue of federal law. The thing that I think really points ... I'm not, by any means, an expert on Louisiana charter schools, but I'm familiar with Texas charter schools, and the impression I have is one of the benefits of the charter school movement as part of the broader education reform debates in our country is that it allows us to channel private sector innovation. Would you agree with that? Yes, Your Honor. Absolutely. Would it be fair, then, to say that one of the benefits of charter schools is that they're not political? I think so, generally speaking. It seems fair to me. That one of the benefits of charter schools is that they're not political? I mean, I can't speak with any authority to that, but it makes sense to me. But you see why I'm asking. The test here, what Congress has set out to exclude is political subdivisions, and I think we agree that sort of the nature of charter schools is that they're not political. Well, Your Honor, I think when Congress uses the phrase political subdivisions, what it's meaning to refer to is not politics in the sense of political science, but politics in the sense of, is the entity at issue, in effect, an administrative arm of the state? And I think here, Voices meets that test, and I will get to that in some detail in just a moment. But before I leave the... I mean, the selling point, I think as Judge Ho is alluding to, a big selling point of charter schools is we're not under the constraints of public schools. The public accountability and oversight isn't as tight, which is what allows us to do this experimentation, and then that's why you should come to our schools, and the New Orleans charter schools in particular have a very good track record of getting better results. So isn't it somewhat at odds with the whole idea behind charter schools, which is independence from school boards, from state education commissions to say that they are, in fact, political subdivisions? No, I don't think so at all, Your Honor. I think on the contrary, the very things that you just described that I agree with, and of course, in New Orleans, the charter school system is the public school system. I think that argues for charter schools to be outside of the jurisdiction of the National Labor Relations Board, not within it. I mean, I think that we're mixing apples and oranges. But that may be a great policy argument for Congress. I'm sorry? That may be a great policy argument for Congress, that we don't want the NLRB to be involved in this, and as I understand it, there's actually some discretion, the NLRB could simply on its own get one to local government. But that's obviously not what you're talking about here, you're talking about political subdivisions. Right. Right. But, Your Honor, I think— Is there anything in the record about political, that somehow this is because as a matter of public policy, charter schools are conceptualized this way? Is there anything in the record about that whatsoever? No, Your Honor, I don't think there is. I've read the record. I think— So in the record, is there some evidence that it is a political subdivision because its board members are subject to removal by public officials? There's nothing in the record that sets forth that. That is, of course, the board's argument, but I don't think there's any argument in the record or any evidence, you know, that advocates that one way or the other. There is evidence that the officials, that the administrators of Voices are answerable, they are subject to being removed under the Louisiana Code of Governmental Ethics. Mr. Malfeasance, is there anything in the record to say, as these charter schools are prepped, you know, they're all over the place in New Orleans, as you say, they're 80 percent or so of the school system. Is there any evidence as to how often or if ever that removal authority has been exercised? There's no evidence, but I know that it has been. Your Honor, I just want to go back— Do you concede that, it seems to me, if they're a political—if you win here and they're a political subdivision under the NLRA, that seems to be, mean they would automatically be state actors subject to lawsuits by students, by teachers, you know, for due process, for First Amendment religion and speech issues. Do you concede the charter schools are a state actor for constitutional purposes? I honestly haven't thought through the state actor question. I would concede that it would mean that Voices is subject to state labor law. That's certainly true, and I believe that's what Congress wants. I believe that Congress wants— But I'm curious on this because, I mean, it's one of these things, be careful what you wish for. You know, you might get sued for religion problems, student speech. We see these cases all the time in the regular public school system. Teachers saying, I didn't get due process, and, you know, I mean, you know what I'm talking about, but— But I don't think that a decision on whether Voices is a political subdivision answers the question of whether it's a state actor. I wouldn't—I mean, it seems to me state actor is actually broader than political subdivision, but how can you be a political subdivision and not a state actor for the Constitution? Well, I just don't—I would have to get into the law and state actor, frankly, Your Honor, to give you a real answer. I don't think one equals the other. I understand that it would certainly be relevant. I do want to just go back to the questions, the whole line of questions about political subdivision with the emphasis on political as though that means politics in terms of the day-to-day, you know, arguing politics. I don't think that's what political means in the phrase political subdivision. Well, if I may, this may be my fault in injecting this issue. What I think about politics is not the pejorative politics. What I mean is political accountability, you know, an election by the voters or appointment by the governor or a Senate confirmation. That's what I mean. And it seems to me that your entity is completely created in the private sector. All the people are appointed by the private sector. That's not something we typically associate with a politically accountable institution. Well, Your Honor, I think the answer to that, it lies in Hawkins County, which is the only U.S. Supreme Court case interpreting this exclusion. And what the Supreme Court looked at was it did consider what you were referring to, whether the administrators were appointed by, they were hired or could be fired by government officials. But it also looked at a host of other factors. And those other factors included things like whether the entity was a nonprofit, whether it was tax exempt, whether it was subject to public records laws, whether it was subject to other laws that applied to other political subdivisions. All of these things are argued, argue in favor of voices being considered a political subdivision. Some of the other laws that it's subject to are it has to provide an annual budget to the government. It has to undergo an annual audit by the government. It's subject to open records laws, open record by the state. Right. Yes, Your Honor. And voices is subject to open both open meetings, laws and public records requests. And it's considered a state educational agency. Yes, it is, Your Honor. And this is all a result of voices being subject to what's called Bessie 126, which is the required to be adopted by any charter school contract. So all of this flows from that. And to come back to the hiring and firing, Judge Howard, you started the board has made very clear now that it doesn't require both for its test. It only requires one or the other hiring or firing by public officials in what's the case for that. Well, they've said it in their brief. They use the word or very pointedly and in all their the flurry of 28 J submissions, they're very clear that it's either or both aren't required. And the significance of that is that when you look at so what's important for us, because we readily concede that our administrators are not appointed by the state. But we do argue. So putting aside the removability is limited to sort of malfeasance fraud. You agree that you can't remove someone because you don't like the policy choices, the charter schools taking right, you don't like their curriculum, and that's not a basis to get rid of them. That's correct, Your Honor. And that's exactly the point I want to make, which is that's exactly the same as Hawkins County and Hawkins County. The only way to remove officials from the utility district was under what was called the Tennessee ouster law that the parallel, the analog of the Tennessee ouster law is the Louisiana Code of Governmental Ethics. Both are ouster laws. Both apply only to government employees. That's right. But they are they also that the county public official appointed the board. Well, that's true. But remember, the board can't revert to that because it's conceded. And I think if you ask them, they will concede. They don't require both appointed and, you know, the hiring and firing. It's hiring or firing. I have one more question. You you make the argument that education is a core government function of local governments, which, of course, it is. Criminal justice is also a core function of state governments. State of Louisiana, as I'm sure it does, contracts out to private prisons. Are those private prisons political subdivisions of the state? I think that it's a fact sensitive question that would depend upon the relationship between the private prison and the state. And if it if the administrators of the private prison were subject to removal by government officials, as are the administrators of voices, and if all the other indicio were present, which the board wants to ignore, but which argue in favor of considering a political subdivision, I would say yes. If those indicio weren't present and the other thing weren't true, I would say no. And one point I want to make here as my time grows short is that not only are the administrators of voices subject to removal under the Code of Governmental Ethics, which in and of itself is significant, that's treating them as government employees. It only applies to government employees. It's the same as in Tennessee. But they also are at risk of losing their jobs because the the state officials have the right. They have great discretion to terminate the charter completely at their whim. If they believe that Voices isn't fulfilling its obligations, and of course, I want corporate law that said, you know, because obviously state law creates the corporate authorizes corporate charters, right, provides limited liability and whatnot. What if we had a provision of state corporate law that said in cases of corporate malfeasance, the state's secretary of state can take an action to remove the malfeasance board member? Would that turn Walmart into a political subdivision? I think that would. No, I don't think that alone would at all. I think that it would be one because it was also subject to the state's public records law. You know, I mean, every every hypothetical would be very fact sensitive and we'd have to look at everything. In my mind, that alone would not do it. Of course, but we could get to the point where Walmart would be a political subdivision under your theory. It's I cannot see a world in which Walmart, remembering who Walmart is and what it does in which Walmart would be a political subdivision. I do agree. Why not? Because it's a it doesn't it has no state purpose. It's it exists purely for profit. Let's say they start getting the health care business. Well, I remember about Walmart getting into the health care business. Well, Walmart is a for a lot of public funds that go into private delivery of health care. I'm sorry to take your time, but no, no, no. I mean, just to answer your question, Joe, Joe, almost all the cases require the entity to be a nonprofit. Walmart is the opposite from a nonprofit. It's a for profit company. So it's hard for me to imagine how it could how it could possibly be considered a political subdivision. I see that my time is up. Unless you have any more questions, I'll be back on rebuttal. Thank you. Good morning, your honors. Greg Lerow for the National Labor Relations Board asking this court to enforce the board's order. Have you ever enforced an order like this one in a place where 90 percent of the schools were under this format? Not that I'm aware of, your honor. But what we do know, I mean, that's extraordinary, isn't it? It's not some one off little thing. It's a no, no. I understand that the nature of what happens here and I think it goes to two things I'd like to touch on based on your honors discussion this morning. One is I still say that the board's determination that this one charter school created by private individuals and run by private individuals who have final authority over the school's operations and control over its labor relations is not a political subdivision under prompt to. But to go to your other point, this accords with choices the state made to take advantage of private enterprise. The state chose to allow private citizens to create these schools and boards composed of private individuals who choose what other private individuals will join them to run the school and to control the labor relations. And I think this is important because when you look at the policy of the political subdivision exemption, it goes to two things. One is oftentimes public employees lack the right to strike. But of course the state Supreme Court held here that public employees have the right to strike. And the other is avoiding undue interference with the state's relationship with its own public employees. But here when you look at the choices the state made and you see this in the charter law, you see this in the charter agreement, it said voices, you will run the school. You will hire and fire teachers. You will set their terms and conditions of employment. Nothing in the board's jurisdiction here will interfere with that choice or the state's labor relations, which are separate. But the point is when you look at the facts we have here, and they're largely undisputed, we have what this court has called a private self-perpetuating board. My opponent cites no case where you had those circumstances and yet the entity was found to be a political subdivision under prong two. Now I know my opponent mentions, well, let's look at other characteristics, but those have been addressed by precedent as well. And I'd like to say, first of all, this court- It's been addressed here by the board. Well, a couple things, Your Honor. As the board said, the board in this case said, we've addressed charter schools recently in the Penn Charter case and the Hyde case where you had very similar charter school operations and we rejected some of the arguments that are made here, like we have their characteristics were publicly funded, for example. This court has also addressed that argument in the Hivey case we cite. There, the court explained, you have this private self-perpetuating board, therefore you are not a political subdivision under prong two, and the entity, which happened to be a nursing home, said, but we receive public funds, we have to issue public reports, we have tax exemptions, the state in some ways constrains our operations and screens who can be a patient. We have to seek permission to make improvements on the facility, and still, because of that key fact, the private self-perpetuating board, it was not a political subdivision under prong two. And what I would submit is, my opponent, who does have an appellate burden here to show the board abused its discretion, cites no case or factor that compels the board to find, in these circumstances, that the school was a political subdivision of the state. Okay, but one of the things we have to decide is, did the board abuse its discretion in applying the test in a way that's different than we would apply the test, right? And so, if they collapsed the test down to two prongs and only considered this one thing and didn't consider the robust, the other factors that would be relevant under Hawkins County, then it might abuse its discretion for not doing the test right. And that's what I'm trying to figure out is, is it your position that they did use the one factor under prong two and have that be dispositive, or is it your view that there was a totality of all the factors here on this record, this particular record? Well, I'll be candid. The board did say that this factor of a private self-perpetuating governing board can be dispositive. It's very strong evidence. But this Court has said the same thing. But also, the board said, well, that's often sufficient to find that it's not a political subdivision. It also did address arguments about other characteristics, as my opponent puts it. Well, there's a case in Hawkins County itself, and there's other cases where they find that that first factor of who appoints and can remove board members, that that favored it being a political subdivision, then they went on to see other indicia of it being a political subdivision. Are there any cases where a court has found that the board selection and removal process was not indicative of a political subdivision, as was found here, yet then went on to analyze all these other factors? I want to make sure I understand Your Honor's question. I am not aware of a case where it's like this one. You have a private self-perpetuating board, and the court goes on to find, because of some other factor, it's nonetheless a political subdivision. Then the answer is no. I'm aware of no such case. Let me ask you, there's, I mean, political accountability, if not the factor, is certainly a big factor. I think everyone would agree. And as, I think as has been alluded to, I mean, a selling point of charter schools is, at least as compared to regular public schools, they have less political accountability. But I look at the charter school law in Louisiana, I mean, and it exempts charter schools from a lot of requirements, but it's still, there's 44 laws it subjects them to, including, you know, you have to teach the Constitution according to state law, teaching regarding sex according to state law, corporal punishment, all these different things. It goes on and on. Doesn't that show there is a great deal of political accountability, even if not as much accountability as regular public schools? I don't think it shows political accountability. I think what the Board of Courts have said in saying that you're not a political subdivision just because there's significant state oversight is, that's not necessarily any different than the regulation or oversight faced by other private entities who contract with the government. They face regulations, their choices are constrained, but they're still making choices. So that fact alone is not dispositive. So is it your position that the NLRB can reasonably ask one question, whether the entity's administrators are subject to appointment or removal by public officials or electorate, in order to determine whether an entity is a political subdivision, and that one question is dispositive? I do think that one question can be dispositive. I don't know if the Board's analysis is a little more robust than that here, because in adopting its analysis in Penn Charter and Hyde, the Board acknowledged other characteristics may be looked at, but they don't carry the day here. And I'm not trying to evade your question, Your Honor. My point is, here, the Board applied the precedent much like this court has. This court said there's a lot of weight put on that factor you mentioned, the private self-perpetuating Board. We see that in Highview, we see that in Natchez, we see that in other cases. And in StarTran, this court noted, usually, when you meet prong two, it's because a majority of your governing Board members were picked by the state. And that's just not the case here. What about removal? Well, I am aware of no case that found that the kind of limited removal authority we have here was sufficient. Here, as Your Honor's noted this morning, this isn't like the power the Board members have over each other, where they can add or remove each other with a lot of discretion. Here the state can remove someone for particular instances of conflicts of interest, malfeasance such as abuse of office for financial gain. As you were discussing this morning, you can't say, I don't think that person's doing a good job running the school. I don't like their policies. I'd like to remove them. They have to be found to have engaged in this targeted malfeasance. After, I believe, a complaint and a hearing, this is a far . . . Can I talk about public Board members in some states? You know, Mississippi's law differs from Louisiana's in that regard. Just had a case recently about a Board member and whether or not they had had all the proper due process that they needed to have. So many public Board members have the same kind of removal process. No, I understand that. I'm just trying to grapple with what authority does my opponent cite to say that the removal authority we have here is sufficient or even compels the Board to find that they're a political subdivision? Because the Board does have some discretion in interpreting this political subdivision exception. And what I was saying is, we have a case like Elkhorn . . . Can you comment on the other side's view that . . . do you agree with his characterization of the Board's position that it's sufficient either to have the appointment or removal power, just one or the other? That's what I took him to be characterizing your position as. Do you agree that that's your position? I understand here you're saying the removal power is limited, but if it was a robust removal power, would that be enough? I would concede it's possible. I don't think there's . . . I mean, I can imagine a removal power that might be sufficient on its own because it would show direct accountability. Well, I'm just still confused then because if removal power is often . . . has due process constraints and cause requirements in regular public school, then why isn't it parallel enough to being a political subdivision, this removal power? Well, Your Honor, all I can say is in this case, the precedent has been set forward that the Board will find you have sufficient removal power if, like in LTTS, you're talking about something that's broad and practically unreviewable and the State can reconstitute the Board. And what's interesting is in LTTS . . . This removal power can't be used by the State to implement policy changes in the charter schools, right? I think that's right because it's defined as particular malfeasance, not a policy disagreement. We don't like, oh, you've gone to an all-boys school, a lot of these charters around the boys are all girls. The State can't say, oh, we don't like that. It's got to be, you know, co-ed institutions. We're going to remove the Board and get some people who like co-ed schools and they can't do that. That's right. And in the LTTS case, it was more like that because the State, in exercising this broad power to reconstitute the Board, is actually directed by Texas law to consult with community leaders. In other words, the general electorate to bring in that political or public input. But in LTTS, it said only under certain conditions can it reconstitute. So there were limits. It was not this broad . . . it's characterized as being this broad power, but there were conditions on the power in LTTS itself. I'm not denying that there are some conditions, but I still think that the power to reconstitute a governing body is much broader than the power to wait for someone to be found guilty of malfeasance and then you can remove them, especially when in LTTS you do have this political or public component of going out and soliciting public input of who should be on this governing body. We don't have that here. What is the difference between the Alster law in Hawkins and the Alster law here? The biggest difference is actually the context. The Supreme Court found that that body was a political subdivision under Prompt II in large part because there a county judge had full authority to appoint the governing board members. And on top of that, there was an Alster law. No, no, no, I understand. But Alster can be good enough, and so I'm asking what's the difference between the Alster law in Hawkins County and the Alster law here? The difference between the Alster law in Hawkins . . . I mean, I understand what you're saying. An Alster law can be good enough if it's as broad as what you have in LTTS. I think . . . And this is very comparable to Hawkins Alster law. I don't know that it is because I don't think . . . That's what I'm asking. What's the difference? In this case, it's targeted to specific instances of malfeasance that are proven after a certain process, a complaint and a hearing. I'm not sure that the Alster law in Hawkins was similarly tailored, and I do think the Alster law in Hawkins was focused on the fact that the judge could pick the board members. What I'm saying is, if you have a context where a public official can clearly pick the board members, that may alter your view of what kind of removal power also goes into the equation. I do think the context matters. I don't think Hawkins says or holds that that Alster law on its own was sufficient. I don't think you can tell that. I think the key thing is the judge picking who was on the panel. If we were to hold, and this is not foreshadowing, it's a hypothetical, that the test was not applied properly because it was too limited to just one factor, and it should have been applied to all the factors, and there's not evidence in the record that the board used all the factors, should we remand it to the board, or should we resolve the case on the It would depend, Your Honor, whether, say you found that was an error, you view the board as actually looking at those factors and adopting its prior decisions in Hyde and Penn Charter, which rejected arguments based on those factors. Where the board candidly said, this private board issue should be sufficient, but we'll also look at these other factors, but at the end of the day, this is where the state is handing over labor relations of this school to a private entity. So unless Your Honors have other questions, I thank you for your time. Okay. Thank you. Your Honors, may it please the Court, my name is Julie Richard Spencer, and I am counsel for the intervener in this case, the United Teachers of New Orleans. I want to start by going back to a question Judge Costa asked, which was, what is in the record as to control and operations of the school? This case and the record goes back to a hearing that was held before the National Labor Relations Board attorney, where the parties submitted what evidence they wanted to submit about jurisdiction issues under 2-2 of the Act. And in that hearing, back almost two years ago, the parties actually stipulated to this pertinent fact, and that is that the current members of the Board of Directors and those that have changed since 2012 are private individuals appointed to this Board by the Board of Directors and not appointed or controlled by any public elected official or state agency or political subdivision of the state. And that stipulation was proposed by the Union Council and agreed to by counsel for voices. And I think we start with that premise, that at that point, the record stopped in terms of submitting additional evidence about what control the state might have over this Board of Directors. And the reason the unions did not put in additional evidence or seek to put in additional evidence, which might have addressed some of these issues, is because of that stipulation. Now, voices has gone back and is attempting to say, well, there is control. And the reason there's control is because of this ability to potentially remove a Board member because of the Louisiana ethics laws. The problem is that the Board has the — that voices has already stipulated away that control mechanism in its own hearing before the National Labor Relations Board regional attorney. How did it stipulate it away? I think it did when it stipulated that the Board of Directors was not appointed or controlled by any public elected official or state agency or political subdivision. And I think that stipulation was relied upon by the union in not continuing to submit evidence or solicit testimony or question witnesses regard to the removal powers, so that the question Judge Costa asked, we don't have an answer to on the record. Has this power ever been removed? Yes. Which is, has this power ever been used in the State — in New Orleans? We don't know what the answer to that is. We just know on the face of it what it says the power is. But the reason we don't know the answer to that, Your Honor, is because voices stipulated to the fact that there was no control, no control over — there was no — that the elected official, state agency or political subdivision, either appointed Board of Directors members or controlled them. And so if — You think removal is subsumed in that. I think removal is clearly controlled. But I also have an answer for Judge Alrod about what is the difference between the Tennessee ouster law and our law, our ethics law here, because they are not the same, Your Honor. The Tennessee ouster law does include a broader scope of basis for removing public officials. The Louisiana Code of Ethics deals with things like nepotism, self-dealing, malfeasance in office. But the Tennessee ouster law is much broader. It allows for removal for those things, surely. But it also allows for a neglect of duty, failure to perform duties, and any law — a potential violation of moral turpitude. So that that removal power is much broader, more akin to the removal power that Texas has in LTTS than what we have in the state of Louisiana, where our Code of Ethics is written very narrowly to cover a very narrow scope of issues. Similarly, in the Louisiana ethics law, the matter has to be brought before the Board of Ethics. It cannot be initiated by a private citizen. A citizen can't file a lawsuit to oust a member of a board. It's interesting that the teachers' unions are taking different positions in different states. I mean, I guess it's strategic and understandable. In New York, the teachers' union was arguing it wasn't under the control — the charters weren't under the control of federal law because they wanted New York law to apply. What's the difference here if Louisiana law applies? Well, I think Louisiana's law is written very narrowly. And it was done intentionally by the legislature. When the legislature enacted the statute in 1997, it knew about Hawkins County. It knew what a political subdivision was, and it knew what the definition was and how it had been applied. It very carefully crafted — From a labor law perspective, if we say no, no federal law, you're under Louisiana labor law. What's the difference in terms of union members? I think in terms of — what it does is it does not give employees the right to self-organization. Because under Louisiana law, we do have jurisdictions where public school boards recognize and collectively bargain with teachers and school employees. But the difference is, under federal labor law, teachers have a right to initiate that whether they get to engage in collective bargaining. And there is no indication that the Louisiana legislature intended to preclude that. The voices and the amici both cite state sovereignty concerns, but none of those were concerns that the Louisiana legislature had. They did not, for example, identify the entity as a local school board or a local — or a political subdivision in the Act. It could have. It has done that in other instances, for example, with the transit company operating out of New Orleans in the Smith case that we cited in our brief. I think that — have you answered his question? Your time is up. Oh, I'm sorry. I apologize. I didn't see. Thank you so much. Thank you. Your Honors, I'd like to start with the stipulation argument that we just heard. I believe that what counsel is referring to is at pages — it's very early in the record — pages 19 through about 22, and the stipulation was that there is no input from public bodies into the operation of the school. That simply is not a stipulation about the removal of administrators, and I believe that counsel is stretching to portray the stipulation that way. It sounded like it was a different stipulation when she read it, so I'm not sure that's the same thing she's talking about. What is the control? I mean, doesn't — isn't your point that removal thus gives the state control? I mean, control seems to be the ultimate question. Is there state control? And so isn't that troubling that you — if that's accurate, that you conceded no control of the board, public control of the board? No, Your Honor. I believe that the stipulation was that the day-to-day affairs of the school are run by voices. I believe that's what — and in context, when you read it, I believe that's what the The other — the other point that I want to make about the — the ouster law, counsel was asked whether the ouster law was similar to the ouster law in Louisiana. Well, I invite Your Honors to read the ouster law. It's at Tennessee 847-101. It's cited in the Hawkins County case. It does not provide for discharge of administrators in Tennessee because they're not doing their job. It doesn't mean that administrators in Tennessee serve at the pleasure of the government. Instead, it's very limited. It allows — and I'm looking at the article — it allows for discharge only for misconduct in office, violating the laws of the state, intoxication, illegal gambling, and violations of penal statutes involving moral turpitude. Those are the five factors. There's actually an interesting Tennessee Bar Journal article — it's in the February 2016 Tennessee Bar Journal — that talks about how limited this is, that the courts have interpreted it as a very drastic remedy, that it's only allowed where there's clear and convincing evidence. It's very similar to the Louisiana Code of Governmental Ethics. Neither allows the government to oust government employees at the broad discretion of any public officials. They're very limited. Judge Elrod, you asked counsel the question whether or not a single factor is enough. And counsel never really answered that question, but I invite you to read the board's briefs where they do concede that a single factor is enough. And that simply is not a reasonable interpretation of what is a political subdivision. Judge Costa, you asked, given that they are trying to argue the discharge, or hiring or firing, whether either is enough. And counsel never really answered that question either, but they answered it for the court in LTTS. In LTTS, the charter school was found to be a political subdivision. There was no right to, there was no appointment of those administrators. The only argument there was about the firing of the administrators. So counsel falls back and says, well, but the grounds were broader. They could be fired for violating the charter contract, for violating public accounting standards, for these types of broad things. These are the exact things, almost word for word, that under Bessie 126, the governing law here, which is incorporated into the contract, gives public officials the right to terminate the charter completely. It's a broader right. It subsumes getting rid of the administrators. After all, if you terminate the entire charter, you're terminating the administrator's jobs along with it. And I think it bears emphasizing that — The Texas law said they could remove people failing to protect the welfare of the students, failing to satisfy performance standards. Your Honor, this is exactly my point. Those are the things in Bessie 126. And if you look at the contract, and we cited the page number in the record in our response to their 28-J letter on LTTS, those same factors — What about my question? Could they fire the board member because they didn't like the charter school going with an all-boys school? In Louisiana, could they remove the board members and force it to be — put people on to make it an all-boys school? I think the answer is no, and I think they have the same answer in Texas. I think they're both circumscribed to that extent. But the point that I would make, Your Honors, is that Voices — you know, they try to portray Voices as just another contractor. Voices is not just another contractor. It exists solely for the purpose of operating international high school. And if you take away the charter, you are killing the entire — the entire operation. And so, of course, the administrators — I'm not making an argument. Okay. Thank you very much, Your Honors. The Court will take a brief recess before considering the final case for today.